## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| Jacques Calixte, individually and on behalf of all others similarly situated, | 1:22-cv-01855 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| Walgreen Co., | |
| Defendant | Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations pertaining to Plaintiff, which are based on personal knowledge:

1.    Walgreen Co. ("Defendant") manufactures, labels, markets, and/or sells Gift Cards or stored-value cards under its own brand and for third-parties at its thousands of stores nationwide ("Gift Cards").

2.    Over the last decade, gift and prepaid card usage has increased to $200 billion annually in the United States.

3.    Reasons for increased usage of gift cards are varied.

4.    First, gift cards are often used in place of cash or checks, providing funds in a more convenient form.

5.    Second, retailers promote gift cards because they drive consumers to their stores and encourage those customers to make additional purchases beyond the value of the card.

6.    Third, consumers like gift cards because they reduce the guilt of purchasing indulgences they otherwise would not have, if they received an equivalent amount of cash.

7.    Fourth, many security experts recommend using gift cards over traditional credit/debit cards to retain anonymity and reduce the risks associated with retail data breaches.

8. Fifth, the growing numbers of Americans who are "unbanked" or lack a traditional bank account, increasingly rely on gift cards to make purchases.

9. However, gift cards are the fastest growing source of fraud, with losses in the billions of dollars.

10. Gift cards are targeted by unscrupulous actors for several reasons.

11. First, fraudulently obtained or accessed gift cards can be used to make e-commerce purchases without first transferring the funds to a bank account, allowing the wrongdoer to maintain anonymity.

12. Second, gift cards can be used at ATMs, converting funds to cash with ease.

13. Third, prepaid cards are not linked to a user's identity, which makes them useful for money laundering.

14. According to law enforcement agencies, gift cards are increasingly used in drug and sex trafficking operations and in preparation for terrorist attacks.

15. The physical properties of gift cards also make them uniquely vulnerable to fraud.

16. Traditional credit and debit cards comply with the Europay, Mastercard and Visa ("EMV") standard.

17. Such "Chip-and-PIN" tamper resistant EMV cards run code to perform authentication of an original card with the issuer at the point-of-sale ("POS").

18. However, an EMV card costs $2.00 to produce, while magnetic stripe cards cost $0.08.

19. Gift card manufacturers and merchants who accept gift cards concluded that if they were required to use higher quality cards, they would not make as much money selling gift cards.

20. The result is that gift cards rely on a simple magnetic stripe to encode a static account

identifier, which is more easily recorded, cloned and reused in later transactions.

21.    Prepaid cards can be compromised in multiple ways.

22.    The first way involves an attacker entering a store and gaining physical access to the gift cards.

23.    According to Katie Jennings of the Lynchburg (Virginia) Police Department, this method of tampering usually happens in bigger chain stores, such as those owned by Defendant.

24.    In some cases, the magnetic stripe is physically accessible at the store on a rack.

25.    If not, the attacker opens the package to access and record the magnetic stripe data.

26.    If a PIN is present, the attacker removes the security tape to obtain the PIN and replaces it with a commercially available equivalent.

27.    If a PIN is obscured by scratch-off material, the attacker scratches off the material to record the PIN, replaces the scratch-off and reseals the package.

28.    The second way involves the cards being compromised or tampered with before leaving the factory.

29.    This means that purchasers are unable to tell if a card was physically tampered with by examining the packaging.

30.    The attackers can then selectively target all cards which have not been used after a defined period of time, based on the assumption the purchaser lost or forgot about the card, which is what Plaintiff experienced.

31.    A third way is obtaining card data through increasingly common data breaches.

32.    These incidents are common since prepaid card companies often outsource management of their cards to third-party processors with lax security protocols.

33.    A fourth way involves the use of "bruteforcing software" to determine card numbers

by rapidly cycling through all possible PIN and number combinations.

34.    A fifth way involves the cards being compromised at the point of activation.

35.    According to Julie Wheeler, President of the Better Business Bureau of Western Virginia, in certain scenarios, the breach may occur "wherever the[y] [purchaser] activated [the card]," such as the activation site maintained by the card company.

36.    Wheeler cautions purchasers that when they activate the card, "to be on a secure device," and that "everything is being encrypted."

37.    In all scenarios, the attacker uses the card data to purchase items online or create a new physical card with the data associated with the original purchased card.

38.    The counterfeit card is used in-store to purchase goods which are almost always sold immediately for cash.

39.    The various methods through which gift cards can be compromised results in different dispute scenarios, which frustrates purchasers like Plaintiff when they seek recourse.

40.    Commercially viable methods exist to significantly reduce the likelihood of fraud related to gift cards.

41.    One method is based on detection of jitter at merchant POS terminals, which can detect counterfeit cards with 99.9% accuracy.

42.    In manufacturing physical gift cards, the encoding of bits on the magnetic stripe produces variations in the physical distance between transitions, which is known as "jitter."

43.    Cards produced in automated facilities exhibit more consistent bit lengths compared to cloned cards, typically created by hand through inexpensive encoders, with greater variance in the placement of bits.

44.    When cards are swiped, the POS terminals are capable of detecting cards with higher

jitter and comparing this to the card manufacturer's specifications.

45.    In selling Gift Cards, Defendant failed to ensure that third-party card manufacturers and POS terminals were able to measure jitter in swiped cards.

46.    Defendant failed to utilize additional security measures such as sending an email or other secure communication to the purchaser with activation instructions.

47.    Defendant failed to take adequate and reasonable measure to ensure third parties did not tamper with the Gift Cards it sold.

48.    Defendant failed to warn of the probability and/or possibility that the Gift Cards it sold had been or could be tampered with or compromised by third parties.

49.    Defendant failed to disclose that its Gift Card policies and security practices were inadequate to safeguard Gift Cards against theft.

50.    Defendant failed to adequately train and require its employees to carefully and consistently inspect Gift Cards prior to sale for evidence of tampering, such as crooked security tape, scrape marks from tape removal, non-factory security tape, and tape residue edge marks from original security tape.

51.    Defendant makes other representations and omissions with respect to the Gift Cards which are false and misleading.

52.    Reasonable consumers must and do rely on a company to honestly and lawfully market and describe the components, attributes, and features of products and services it sells, relative to itself and other comparable products or alternatives.

53.    The value of the Gift Cards that Plaintiff purchased was materially less than its value as represented by Defendant.

54.    Defendant sold more of the Gift Cards and at higher prices than it would have in the

absence of this misconduct, resulting in additional profits at the expense of consumers.

55.    Had Plaintiff known the truth, he would not have bought the Gift Cards or would have paid less.

56.    As a result of the false and misleading representations, the gift cards are sold at a premium price, excluding tax and sales, higher than similar stored-value cards, represented in a non-misleading way, and higher than they would be sold for absent the misleading representations and omissions.

Jurisdiction and Venue

57.    Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

58.    The aggregate amount in controversy exceeds $5 million, including any statutory damages, exclusive of interest and costs.

59.    Plaintiff Jacques Calixte is a citizen of Florida.

60.    Defendant Walgreen Co. is a Illinois corporation with a principal place of business in Deerfield, Lake County, Illinois.

61.    The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen

62.    The members of the class Plaintiff seeks to represent are more than 100, because the Product has been sold for several years, with the representations described here, in thousands of locations, in the states covered by Plaintiff's proposed classes.

63.    The gift cards are available at Defendant's thousands of stores across the states Plaintiff seeks to represent, and from its website.

64.    Venue is in the Eastern Division in this District because a substantial part of the

events or omissions giving rise to these claims occurred in Lake County, such as Defendant's decisions for selling and marketing the gift cards.

Parties

65.     Plaintiff Jacques Calixte is a citizen of Biscayne Park, Miami-Dade County, Florida.

66.     Plaintiff purchased three Vanilla Visa gift cards on November 4, 2020, at a Walgreens, 567 NE 125th St North Miami, FL 33161, each with $150 and expiration dates of January 2029.

67.     Plaintiff misplaced the cards and did not immediately use them.

68.     In March 2022, Plaintiff found the cards and checked their balances.

69.     Only one of the cards retained its full $150 balance.

70.     The other two had balances of $0 and $5.

71.     Plaintiff obtained records related to the card transactions.

72.     On the first card, the records show that on October 20, 2021, a purchase of $55.00 was made at Target, 41040 California Oaks Road, Murrieta, CA.

73.     Less than three hours later, purchases of $64.65 and $25.35 at Target, 100 Perimeter Center Place, Atlanta, GA 2036.

74.     Even if Plaintiff ever went to the Murrieta Target, which he did not, he could not have traveled from there to Atlanta in under three hours to make the identified purchases.

75.     On the second card, the records show that on October 28, 2021, a transaction of $150 was made at Target, 2270 N Bellflower Blvd, Long Beach, CA 90815.

76.     Defendant Walgreen Co. is an Illinois corporation with a principal place of business in Deerfield, Illinois, Lake County.

77.     Walgreens is America's largest chain of pharmacies, with thousands of stores and

over $72 billion in sales per year.

78.    Pharmacist Charles R. Walgreen Sr. in 1901 founded Walgreens, and initially manufactured his own line of drug products to ensure high quality and low prices.

79.    The Walgreens stores were successful and expanded throughout the Midwest. By 1929, there were 500 stores from New York to Florida.

80.    During the Great Depression, Walgreens made extra efforts to help the many people effected by the economic downturn.

81.    Walgreens was next led by Mr. Walgreen's son, who continued the tradition of quality established by his father.

82.    Walgreens has consistently been a place for consumers to fill their most important needs.

83.    Today, Walgreens sells more than the drug products made by Mr. Walgreen, and offers groceries, household goods, cosmetics, and even small appliances.

84.    From the thousands of Walgreen stores in all 50 states, consumers have confidence Walgreens is not just looking out for their health, but for their general well-being.

85.    Consumers consistently rank Walgreens as giving them the most value for their money, in addition to relying on the advice of their trained staff and pharmacists.

86.    According to surveys, the Walgreens brand enjoys a high level of public trust, more than other national pharmacies.

87.    Walgreens sells gift cards under its own brand and for other companies, like the Vanilla Visa card purchased by Plaintiff.

88.    Every year, thousands of Walgreens customers who purchased gift cards at one of its many stores, are victimized by gift card fraud.

89.     The exact number of victims and extent of their losses may only be known by Walgreens, but during the past 10 years, the dollar amount is expected to be in the millions.

90.     Walgreens continually receives customer complaints regarding gift cards which are reduced in value through no fault of the purchasers.

91.     However, Walgreens continues to sell gift cards, because these drive sales traffic to its stores.

92.     Only Walgreens is able to require that the manufacturers and brands who sell gift cards at its stores ensure the value of the gift cards is not compromised.

93.     In addition to complaints received at its headquarters, Walgreens employees and agents received in-store complaints from customers regarding gift card tampering prior to sale.

94.     Walgreens maintains or can reasonably obtain records indicating when the gift cards are loaded, when they are redeemed, and how and where they are redeemed.

95.     Walgreens has failed and refused to replenish the balance on gift cards purchased by the many customers who have complained to them.

96.     In some instances, for Walgreens branded cards, it has even frozen their accounts.

97.     Walgreens failed to adequately vet the security practices of the companies whose cards it sells to ensure customers would not lose money from gift cards purchased there.

98.     It is believed that Walgreens may receive financial benefits from each gift card sold, which makes them less willing to investigate and remedy the issues described here.

99.     Given that consumers trust the Walgreens brand with their physical health through its pharmaceutical products, they are willing to trust Walgreens with their financial health, through purchasing gift cards.

100.    Minorities are particularly vulnerable from Walgreens' actions and omissions,

because a larger proportion of minorities do not have access to traditional bank accounts and use stored-value cards for their daily needs.

101.  Plaintiff believed and expected he was purchasing a gift card which securely retained the funds deposited to it and had no reason to expect Walgreens would fail to safeguard the money he paid for the cards.

102.  Plaintiff relied on the words, terms coloring, descriptions, layout, packaging, tags, and/or images on the gift cards, on the labeling, statements, omissions, claims, statements, and instructions, made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Gift Cards and separately, through in-store, digital, audio, and print marketing.

103.  Plaintiff bought the Gift Cards at or exceeding the above-referenced price.

104.  Plaintiff would not have purchased the gift cards if he knew the representations and omissions were false and misleading or would have paid less.

105.  Plaintiff chose between Defendant's Gift Cards and products represented similarly, but which did not misrepresent their attributes, requirements, instructions, features, and/or components.

106.  The Gift Cards  worth less than what Plaintiff paid and he would not have paid as much absent Defendant's false and misleading statements and omissions.

107.  Plaintiff intends to, seeks to, and will purchase the Gift Cards again when he can do so with the assurance the  representations are consistent with its abilities, attributes, and/or composition.

108.  Plaintiff is unable to rely on the labeling and representations not only of gift cards sold at Walgreens, but other similar gift cards or stored-value cards, sold by other retailers, because he is unsure whether those representations are truthful.

## Class Allegations

109.  Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Florida Class:** All persons in the State of Florida who purchased gift cards at Walgreens during the statutes of limitations for each cause of action alleged; and

> **Consumer Fraud Multi-State Class**: All persons in the States of Illinois, Arkansas, Iowa, and Montana who purchased gift cards at Walgreens during the statutes of limitations for each cause of action alleged.

110.  Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

111.  Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

112.  Plaintiff is an adequate representative because his interests do not conflict with other members.

113.  No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

114.  Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

115.  Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

116.  Plaintiff seeks class-wide injunctive relief because the practices continue.

Illinois Consumer Fraud and Deceptive Business Practices Act
("ICFA"), 815 ILCS 505/1, et seq.

(Consumer Protection Statute)

117.   Plaintiff incorporates by reference all preceding paragraphs.

118.   Plaintiff believed he was buying a gift card which securely retained the funds deposited to it.

119.   Defendant's false, misleading and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

120.   Defendant misrepresented the Gift Cards through statements, omissions, ambiguities, half-truths and/or actions.

121.   Plaintiff relied on the representations and omissions to believe he was buying a gift card which securely retained the funds deposited to it.

122.    Plaintiff and class members would not have purchased the Gift Cards or paid as much if the true facts had been known, suffering damages.

Violation of State Consumer Fraud Acts

(On Behalf of the Consumer Fraud Multi-State Class)

123.   The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

124.   The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

125.   Defendant intended that members of the Consumer Fraud Multi-State Class would

rely upon its deceptive conduct.

126.   As a result of Defendant's use of artifice, and unfair or deceptive acts or business practices, the members of the Consumer Fraud Multi-State Class sustained damages.

127.   Defendant's conduct showed motive and a reckless disregard of the truth such that an award of punitive damages is appropriate.

<u>Breach of Contract</u>

128.   Plaintiff entered into a contract with Defendant for purchase of the gift cards.

129.   The terms of the contract provided that the gift cards would not be compromised at any point after being purchased.

130.   Defendant breached the contract because the Product did not meet the terms Plaintiff agreed to.

131.   Plaintiff was damaged by the breach, and those damages include the purchase price.

<u>Breaches of Express Warranty,</u>
<u>Implied Warranty of Merchantability/Fitness for a Particular Purpose and</u>
<u>Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.</u>

132.   The gift cards were manufactured, identified, marketed or sold by Defendant and expressly and impliedly warranted to Plaintiff and class members that they would not be compromised prior to being used.

133.   Defendant directly marketed the Gift Cards to Plaintiff and consumers through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, and targeted digital advertising.

134.   Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires.

135.   Defendant's representations about the integrity of the gift cards it sold were conveyed in writing and promised they would be defect-free, and Plaintiff understood this meant a gift card

which securely retained the funds deposited to it.

136.  Defendant's representations affirmed and promised Plaintiff was buying a gift card which securely retained the funds deposited to it.

137.  Defendant described the gift cards so Plaintiff and consumers believed it securely retained the funds deposited to it, which became part of the basis of the bargain that it would conform to its affirmations and promises.

138.  Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Gift Cards.

139.  This duty is based on Defendant's outsized role in the market for this type of Product, a trusted company, known for protecting the physical health of its customers, causing them to expect it would not jeopardize their financial health.

140.  Plaintiff recently became aware of Defendant's breach of the Product's warranties.

141.  Plaintiff provided or will provide notice to Defendant, its agents, representatives, retailers, and their employees.

142.  Plaintiff hereby provides notice to Defendant that it breached the express and implied warranties associated with the Gift Cards.

143.  Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

144.  The Gift Cards did not conform to their affirmations of fact and promises due to Defendant's actions.

145.  The gift cards were not merchantable because they were not fit to pass in the trade as advertised, not fit for the ordinary purpose for which they were intended and did not conform

to the promises or affirmations of fact made on the packaging, containers or labels, because they were marketed as if it securely retained the funds deposited to it.

146. The Gift Cards were not merchantable because Defendant had reason to know the particular purpose for which the Gift Cards were bought by Plaintiff, because he expected a gift card which securely retained the funds deposited to it, and he relied on Defendant's skill and judgment to select or furnish such a suitable product.

147. Plaintiff and class members would not have purchased the Gift Cards or paid as much if the true facts had been known, suffering damages.

<u>Negligent Misrepresentation</u>

148. Defendant had a duty to truthfully represent the Gift Cards, which it breached.

149. This duty was non-delegable, and based on Defendant's position, holding itself out as having special knowledge and experience in this area, a trusted company, known for protecting the physical health of its customers, causing them to expect it would not jeopardize their financial health.

150. Defendant's representations and omissions regarding the Gift Cards went beyond the specific representations on the packaging, as they incorporated the extra-labeling promises and commitments to quality, transparency and putting customers first, that it has been known for.

151. These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

152. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

153. Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the

Gift Cards.

154.  Plaintiff and class members would not have purchased the Gift Cards or paid as much if the true facts had been known, suffering damages.

<u>Fraud</u>

155.  Defendant misrepresented and/or omitted the attributes and qualities of the Gift Cards, that it was selling a gift card which securely retained the funds deposited to it.

156.  Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity and deception, through statements and omissions.

157.  Defendant knew of the issues described here yet did not address them.

158.  Defendant's fraudulent intent is evinced by its knowledge that the Gift Cards was not consistent with its representations.

<u>Unjust Enrichment</u>

159.  Defendant obtained benefits and monies because the Gift Cards  not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

  **WHEREFORE**, Plaintiff prays for judgment:

1.  Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2.  Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;

3.  Injunctive relief to remove, correct and/or refrain from the challenged practices and

representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   April 9, 2022

Respectfully submitted,

/s/Spencer Sheehan
Sheehan & Associates, P.C.
Spencer Sheehan
60 Cuttermill Rd Ste 412
Great Neck NY 11021
Tel: (516) 268-7080
spencer@spencersheehan.com